## Heirs of FRIEND ADAMS *v.* HIRAM ADAMS AND HARRY ADAMS, Administrators of FRIEND ADAMS.

### [IN CHANCERY.]

Courts of probate, in this state, have the entire and exclusive jurisdiction of the
settlement of estates, to the same extent, that jurisdiction of matters of con-
tract, or tort, *inter vivos,* is given to the common law courts. The court
of chancery has not concurrent jurisdiction, in this respect, with the probate
court, and will not interfere in the settlement of estates, except to aid the ju-
risdiction of the probate court in those points only, wherein its functions and
powers are inadequate to the purposes of perfect justice, and then in the same

degree, and for the same reason, that it interferes in other cases, where the principal jurisdiction is in the courts of common law.

Unreasonable delay, in the probate court, in proceeding with the settlement of an estate, is no ground for calling in the aid of the court of chancery.

Nor will the court of chancery interfere to grant relief, where some of the parties affected by a decree of the probate court were infants, and had no proper guardians appointed, at the time the decree passed.

The mere fact, that an administrator, rendering his account in the probate court, will not produce the books and papers of his intestate, and is not compelled by the probate court to do so, is no reason why the court of chancery should interfere in the settlement of the estate.

But when there are claims existing between the administrator, or executor, and the estate which he represents, the court of chancery has jurisdiction to examine and adjust them, and the allowance of the claim by the commissioners will not, on account of the defect in parties at the hearing before them,—the administrator representing both debtor and creditor,—be a bar to its re-examination by the court of chancery.

Claims against an administrator, for money and property of the estate, which have come into his hands during the administration, are exclusively within the jurisdiction of the probate court.

The neglect of an administrator to cause an inventory and appraisal to be made of the *choses in action* of the intestate is of no importance in any court.

Under the Revised Statutes of this state real estate, to be regarded as an advancement, must be expressed in the deed to be such, or be expressed to be conveyed for love and affection; and if a pecuniary consideration be expressed in the deed, the estate conveyed cannot be made an advancement, by merely showing, that the deed was in fact executed upon the consideration of love and affection.

The entire subject of advancement is within the jurisdiction of the probate court.

But where the administrators of an estate claim title in themselves to land of the intestate, by virtue of deeds asserted to have been executed by the intestate in his life time, and it appears to the court of chancery, that these deeds were false and fabricated, or were obtained by the administrators out of the usual course, and not in good faith, that court will enjoin the administrators from asserting title under such deeds, and will require them to account for the land as the property of the estate.

Where administrators have received money as compensation for trespasses committed by a third person upon the land of the intestate, the court of chancery,

to avoid all doubt, may take jurisdiction, so far as to cause an account to be taken in that court for the amount so received,—although it would seem, that this matter might be adjusted in the probate court.

Where, upon a bill in chancery being brought in favor of the heirs of an estate against the administrators, it appeared, that the intestate, at the time of his decease, held a note for $1000 against the administrators, and had also a credit for $1000 upon the account book of the administrators, it was held, that the court would presume, that these represented *different* items of indebtedness, and that it was not competent for the administrators, by their answers, without evidence *aliunde*, to show that the credit was entered for the same indebtedness evidenced by the note; and that the administrators could not avail themselves of an alteration of the words, in which the credit was entered upon their books, without evidence *aliunde* of their right to make the alteration.

Where the plaintiff's claim, as set forth in a bill of chancery, rests upon a written contract, and the right of action is not barred by lapse of time, the admission of the contract, by the answer, and the allegation of payment, or of any other matter merely in discharge, are to be treated as distinct, and the latter must be proved, in order to avail the defendant; but, *per* REDFIELD, J., if the claim of the plaintiff rest wholly in oral proof, and the answer of the defendant is relied upon, to make out the plaintiff's case, the defendant may admit such a contract, and allege, that it was in its inception inoperative, or that it has been subsequently paid, or released, and the whole answer, upon both points, is to be regarded as evidence,—although the court are not bound equally to believe all parts of it, but may charge the party upon his admission, and refuse to believe what he says in his excuse.

Where a will was suppressed by those interested in the estate, and administration was taken without regard to it, and the will was never proved in the probate court, the court of chancery decreed the payment of the legacies given by it. *Mead et al.* v. *Heirs of Langdon*, Washington Co., 1834, cited by REDFIELD, J.

APPEAL from the court of chancery. The case is sufficiently stated in the opinion delivered by the court.

*C. D. Kasson* and *C. Linsley* for orators.

*E. F. Woodbridge* and *A. Peck* for defendants.

The opinion of the court was delivered by

REDFIELD, J. This is a bill in chancery, wherein the plaintiffs in substance allege, that they are heirs at law of Friend Adams, late

of Panton, deceased, intestate, and bring this bill for the benefit of all the heirs, or so many as may choose to come in under the claims set forth in the bill.

The bill states,—1. That Friend Adams deceased, intestate, on the nineteenth day of April, 1839, leaving no widow, but leaving the plaintiffs and defendants and some others, his children, and the representatives of such as have deceased;—2. That he had a large property at the time of his decease;—3. That on the second day of May, 1839, administration was granted to the defendants;—4. That they immediately took and have kept possession of all the books and papers of the intestate;—5. That the defendants inventoried real estate, to the amount of $69,776, and personal estate to the amount of about $20,000;—6. That the estate was represented insolvent, commissioners were appointed, and debts were allowed against the estate to the amount of $12,213,92;—7. That from the time of the defendants' appointment until April, 1844, the defendants, without cause, wholly omitted to make any farther progress in the settlement of the estate;—8. That on the twenty first of April, 1844, the probate court required the defendants to render their account of administration on the third Monday of May following; that publication was duly made; that this hearing was continued from time to time until the second day of April, 1845, when the defendants made themselves chargeable for $23,389,69, and charged such debts and expenses, as to make the balance only $5,106,04, besides the real estate, to be distributed among the heirs; and that this account was duly passed by the probate court;—9. That the defendants made application to the probate court for distribution, which proceedings are still pending;—10. That at the time of the settlement all the children of a daughter of Friend Adams, who had married one Ferris, and had deceased, except two, were minors and had no guardians appointed;—11. That in the proceedings before the probate court the defendants would not bring the intestate's papers and books into court, and were not examined upon oath, and refused to give information of what *they* had received as *advancement*, or of how much they were owing the intestate at the time of his decease, or of divers sums of money and property held by the defendants in trust for the decedant at the time of his decease, and refused all access to the books for the purpose of ascertaining these

facts;—12. That on the ——— day of ———, A. D. 183,— Friend Adams was the owner of the Gage lot, consisting of two hundred acres in Addison, worth $5000 ; that Gage was tenant to the deceased; that the deceased conveyed this land to the defendants, in trust, as the plaintiffs conjecture and allege, to enable the defendants to bring an action of ejectment to recover of Gage for the benefit of their father, and, after the recovery, to convey to him; and that no consideration was paid;—or else, that the conveyance was in mortgage;—or else, an advancement;—or else, it was for a consideration to be paid, but which never was paid;—and that Friend Adams had some paper until, or near, the time of his death, which would have showed the true state of facts, and which will show the defendants' liability to account for the value in some way; —13. That in the year 1834 the intestate conveyed to the defendant Hiram Adams a farm in the south west corner of Panton, of about fifty acres, by a deed in the usual form, but which was never recorded until after the decease of his father, and that the land was never occupied by Hiram, but by his father, from that time; that the land was conveyed by Friend Adams to Edwin Adams, to make him a freeholder, and was by him occupied from 1835 until the death of Friend Adams, without claim upon the part of Hiram; that Hiram, finding an old deed to himself among his father's papers, undestroyed, by means of it, and threatening to turn Edwin out of possession, compelled him to buy this fifty acres; and that this has never been in any way accounted for by Hiram, and should be;— 14. That the intestate, some time before his decease, conveyed to the defendant Harry Adams the house and lot where he lives in Vergennes, of the value of $1500, without any consideration; that the deed was never recorded until the ninth day of May, 1839; and that this should be accounted for, the same as the former land deeded;—15. That the defendant Harry Adams, on occasion of his forming a partnership with the Parkers, applied to his father to help him to a capital, and he sold the Hill & Hapgood place, and turned in $500 of the notes, which were the same as cash to Harry, and have never been accounted for; and that this was not known to the plaintiffs, at the time of the settlement before the probate court;— 16. That the intestate held, at the time of his decease, a note for $750 against Harry, of which Harry took possession after the death

of his father, and for which he refuses to account;—17. That Friend Adams made advances to Harry, before he went west, and took from him at that time a certain paper writing, without date or signature, showing that Harry had $1100 of his father's property in his possession ; and that since the decease of the intestate Harry admitted the liability for that sum, and promised one of the plaintiffs to account for it; but that before the probate court he refused to give any account whatever; and that he wholly refused to produce the writing,—as he did also before the probate court;—18. That about the year 1835 Enoch D. Woodbridge recovered a judgment against the proprietors of Addison, for some $600, and levied his execution upon land of the proprietors, undivided, near Snake Mountain; that Friend Adams, being one of these proprietors, and claiming this land, gave a sum of money, about $700, to satisfy the execution and release the land; and that Harry either paid the judgment, or suffered the land to vest in Woodbridge, and then procured it assigned to himself, but now wholly refuses to give any account, either of the land, or the money;—19. That the daughter of Friend Adams, Cynthia, married one Ferris, and their farm, in Chazy, became incumbered, and Friend Adams gave to Hiram $1000, with which to redeem it for the daughter, as advancement towards her share, and that Hiram redeemed the land and sold it for $2000, and put the avails into his own pocket;—20. That about the year 1837 Hiram borrowed $1000 and gave his note to his father, which was among the papers of the intestate, when they came into the administrators' possession; and that the intestate also had a credit on the partnership books of H. & H. Adams of $1000 cash, which they subsequently claimed to be for the $1000, for which the note was given, and finally altered to " sheep," and before the probate court would only account for $700 for both ;—21. That Hiram and Harry occupied the brick store of the deceased, in Vergennes, worth a yearly rent of $175, and Hiram occupied the house of the deceased, in Vergennes, worth a yearly rent of $175, and that Hiram occupied about four hundred acres of the Barnum farm, worth $300 annually, and that Harry occupied three hundred acres of the same farm, worth $200 annually, and that they have given no account whatever of the same;—22. That since the appointment of the defendants' as administrators, they have cut large quantities of

valuable timber on the Barnum farm, committing waste to the amount of more than $1000, and have refused to give any account whatever of the same;—23. That the defendants, about the year 1843, received $200 of Twitchell, for trespasses committed on the lands of the intestate, for which they wholly refuse to account;— 24. That the defendants did not cause the notes and *choses in action* of the estate to be inventoried, or appraised, and only entered such on their account, as they admitted their liability for, being $17,000, and no more, when in fact the deceased died leaving *choses in action* of the value of more than $30,000, which the defendants have put to their own use, as also of large amounts of real estate, which they held *in trust* for the other heirs;—25. The habit of the intestate, in making deeds of land to his children for temporary or occasional purposes, and, when that purpose was answered, their being surrendered, and frequently not destroyed; that some such were made, without having been ever delivered, and were in the possession of the intestate at the time of his decease, and were obtained by the defendants, and that the defendants claimed, that such as were in their names conveyed title to them;—also, the intestate's loose manner of keeping his papers, and the defendants' having access to them for three weeks before his death, and examining them in an " eager manner," and their keeping them away from the inspection of the other heirs, until they obtained letters of administration, and ever since,—except the " Chapin notes," which were for a short time delivered to the plaintiff Daniel, and which contained a memorandum of a settlement between Friend Adams and H. & H. Adams but a short time before his death, and which the defendants refused to produce before the probate court, pretending that they had mislaid or lost the same;—26. That Hiram, in the absence of the other heirs, obtained an allowance of about $2118 by the commissioners,—which was wholly fraudulent;—27. That all the foregoing deeds, recorded after the decease of Friend Adams, were never delivered in his life time;—28. That in January, 1840, the defendant Harry admitted to Edric Adams, the plaintiff, that the two hundred acre farm in Addison and the house and lot in Vergennes should be accounted for by him, and the $1100 received when he went west, and did write down, "Ad.—200—$4000; House, Harry, $1500 ";—29. That the defendants have divers

Heirs of Adams *v.* Adams et al., Adm'rs.

books and papers in their possession, by which all this might be fully understood and justly settled, which they refuse to produce; and that the plaintiffs have made application to the probate court for a re-examination of the account; which proceeding is still pending; that the plaintiffs are without any proof from witnesses competent to testify in a court of common law, and must therefore rely wholly upon the oath of the defendants and the production of papers by them; that the defendants were never required by the probate court to render an account under oath; and that the extreme paucity and weakness of the powers of the probate court to vigorously compel a full and ample discovery, and to do complete justice, make it almost a mockery to go there;—30. That some of the heirs were infants, and had no legal guardians appointed to appear for them, and so had no legal notice, and that others resided out of the state, and had no legal notice;—31. That the other heirs, on application to them to become parties to the bill, declined;—32. And that the defendants have conspired together to defraud the other heirs.

Very much of this bill may be disposed of, without going at all into the answers, or proofs, by reference simply to the appropriate and settled and long and well recognised boundaries between the jurisdiction of courts of probate, in this state, and the court of chancery. In England it is undoubtedly true, to a great extent, that the subject of the settlement and distribution of estates is a matter, over which the ecclesiastical courts and the court of chancery exercise, in some sense, a concurrent jurisdiction. And the court of chancery, in England, have so lightly esteemed the proceedings in the ecclesiastical courts, upon this subject, that they have not hesitated to take the subject from them, after they have entered upon it, or even to revise their decrees, after they have been definitely passed. 1 Story's Eq. Jur. 513, § 542, and cases cited in the notes. This they profess to do, on account of the lameness of the powers of the ecclesiastical courts, and their inability to do perfect justice to all concerned, to the same extent which could be done in a court of equity. Ib. But the American courts of equity have not gone to the same extent, perhaps, in interfering with the settlement of estates before probate courts. But they have generally, I think, held the jurisdiction to be concurrent. *Seymour v.*

*Seymour*, 4 Johns. Ch. R. 409. Such seems to have been the view taken by the plaintiffs' counsel in the present case. But the law of this state is undoubtedly different.

It has always been held here, that courts of probate have as much the exclusive jurisdiction of the matters coming properly within their cognizance, as any other courts of law. Hence, when the court of chancery have interfered in the settlement of estates, it has been merely in aid of the powers of the court of probate, and where, from some defect of the adequate means, it was not in their power to do the same justice, in the same way, which could be done in a court of equity, and which it seemed desirable should be done in the particular case. This is a policy established by a long and uniform course of decisions, upon grounds which have always approved themselves to the profession and the citizens at large, and which there is no necessity and no sufficient reason now to disregard.

It was clearly the intention of our legislature, from the very first, to give the entire jurisdiction of settlement of estates to the probate courts, in the same manner, and to the same extent, that the jurisdiction of other matters of contract, or tort, *inter vivos*, was given to the common law courts. The contemporaneous and constant construction of all statutes passed upon this subject, for more than seventy years, and they have been numerous, and, at different periods, somewhat dissimilar, concur in the same conclusion. This has all occurred with the full knowledge, that the subject was differently regarded in England, and, to some extent, also, in the other American states. And whenever it has become necessary to resort to the aid of a court of chancery in these matters, in this state, which has been but seldom, indeed, that court has uniformly, it is believed, disclaimed any purpose of interfering generally, so as, in any sense, to exercise supervision over the probate court.

The cases, in which the court of chancery have, before this, interfered at all in the settlement of estates, so far as now occurs to us, have been confined within the narrowest limits, as to the subject matter, as well as the number of instances. In the case of unpaid legacies the court of chancery has always exercised a kind of general concurrent jurisdiction, as in matters of account. *Howard et ux.* v. *Brown*, 11 Vt. 36, and cases cited. *Sparhawk et al.* v.

Heirs of Adams *v.* Adams et al., Adm'rs.

*Ex'rs of Buel,* 9 Vt. 41.   In the case of *Mead et al.* v. *Heirs of Langdon,* decided in Washington County in 1834, and never reported, this court set up and decreed the payment of legacies, given in a will never proved in the probate court, but which had been suppressed by those interested in the estate and administration obtained without regard to the will.   This decision went mainly upon the ground, perhaps, of the destruction of the will, and the consequent difficulty with regard to proper parties in any proceeding at law, inasmuch as the legatees were not among the legal heirs and not in the confidence of the administrator, so that the parties *at law* did not in fact represent the interest of the plaintiffs in the bill.   This, too, was perhaps mainly the ground of the equitable interference in the case of *Morse et al.* v. *Slason,* 13 Vt. 296.   There may be some few other cases in our reports, which do not now occur to me ; but it is believed all will be found to go upon the ground merely of aiding the jurisdiction of the probate court in those points only, wherein its functions and powers are inadequate to the purposes of perfect justice, in the same degree, and for the same 'reason, that it interferes in other cases, where the principal jurisdiction is in the courts of common law.

It is to be borne in mind, too, in determining how far a court of chancery will interfere to aid the jurisdiction of the courts of probate, that the probate courts already have a very extensive chancery jurisdiction, by which claims, in some respects of purely equitable cognizance, may be there adjusted.   But for the most part that court has not, by its mode of procedure, such adequate means of giving full redress in matters of purely equitable nature, as exist in the courts of equity.   Hence, as a general thing, no doubt, the court of chancery retains its ancillary jurisdiction to the same extent over matters in the probate courts, which it has over those in the common law courts.

And now, to apply these general propositions to the subject matter of this bill, it must be apparent, that most of it is clearly and manifestly within the exclusive jurisdiction of the probate court. We may in this way fairly dispose of such parts of the bill, for the reason, that, if the *allegations* do not make out a case for the plaintiff, it will be in vain to go into the proofs, inasmuch as the plaintiffs must prevail, if at all, *secundum allegata et probata.*

In following the abstract, which I have made of the bill, the seventh point is the first, which seems to contain the least ground of complaint against the defendants,—and that is mere delay. It will not, I suppose, be expected, that this court will establish the rule, that the court of chancery is to assume the jurisdiction and the burden of settling all estates, where there has been unreasonable delay in the probate court. If this were to become a ground of equity jurisdiction, it is very much to be feared, that the entire business of the common law courts would be absorbed by that court. The eighth seems to us, as we shall have occasion hereafter to show more at length, to afford reasons against, rather than in favor of, the equity interference. The ninth seems to be of no importance any way, unless it be to give a fair and continuous history of the entire proceedings in the probate court.

The tenth is certainly no ground, ordinarily, of equitable interference. That some of the parties defendants in a judgment, in a court of law, were infants, and had no proper guardians appointed, would be, in most instances, only ground of error, at most. In some cases *audita querela* has been sustained, where, by statute, the remedy by writ of error was taken away. But I am not aware, that any general equity jurisdiction has ever been attempted to be founded upon any such basis. Since the determination of this court, giving to the probate courts a qualified and limited power to revise and set aside their own decrees, there can be no necessity for the interference of courts of equity, for any such reason as this.

The eleventh ground of complaint in the bill is one, that has been much insisted upon in the argument, and seems to have been much relied upon as a ground of recovery, from the first. It may therefore merit a somewhat minute consideration. It seems to consist of two parts,—1. The defendants *would not* bring the intestate's books and papers into court;—2. The defendants were not themselves examined upon oath in the probate court. Whether, indeed, the first part of this charge is intended to rest mainly upon the contumacy of the defendants, or the defect of the powers of the probate court, it could have no force to create a jurisdiction in the court of chancery. The contumacy of the defendants, however unreasonable, or persevering, could be of no importance any way. They should be suitably dealt with and taught more *courtesy*. As

to the want of power in the probate court to compel the production of books and papers, and to punish *summarily* for any contemptuous disregard of their orders, I could not myself entertain the slightest doubt.  I entertain no apprehension, that any such doubts would ever occur to any one.  Sitting in the court of probate, I might, indeed, choose to determine all doubtful claims against the administrator, until the books should be produced, and thus compel their production in the manner intimated in the statute in regard to actions of account and book account.  But I could not, I think, hesitate, in a proper case, to take steps to compel the production of books in the probate court, by an express order to that effect.  But it is hardly necessary to determine that question, perhaps, as the other course, of deciding all disputed claims against the defendant, until the books were produced, would be quite sufficient for ordinary purposes, in that court.  This same charge is farther somewhat amplified, in running the matter somewhat more into detail; but no new principle is introduced, so far as we can perceive.  So much of this charge, as rests upon a mere defect of proof in the probate court, is again re-asserted in the final summing up of the case, and will there deserve a separate consideration.

The twelfth, thirteenth and fourteenth are of the same character, and will be considered upon the answer and proofs hereafter.  The fifteenth is merely the charge of leaving $500 of property, belonging to the estate, in the hands of Harry, one of the administrators, at the time of the decease of the intestate, and which has not been accounted for before the probate court.  The sixteenth and seventeenth are of the same character.  The twentieth is similar.  And the twenty first seems to be nothing more than a claim, that, at the decease of the intestate, the administrators were indebted to him, and have omitted to carry that indebtedness into the accounting before the probate court.  The twenty sixth, in which Hiram is charged with obtaining fraudulently a large allowance against the estate, seems to us to come under the same category with the other claims in this class.

This class of claims seems to us to come within the principles of the decision in the case of *Morse* v. *Slason.*  If the administrators were owing the estate, at the time of their apportionment, they surely could not be compelled to put that indebtedness into their

joint account, thus making each, and the bondsmen of each, liable for the debts of the other, when it might not yet have been collected ; and if not voluntarily paid by the other, it does not occur to us, how any legal steps could be taken by the administrator, who was not the debtor, to compel payment. Where the administration is committed to the debtor, and to him only, and he being of sufficient ability to pay at any moment, it may be well enough, and is no doubt generally so done, to make him debtor on his account to the amount of his previous indebtedness to the estate. But this is rather a fiction of law, by which the administrator is charged as having received, during the administration, what he might or ought to have received. And perhaps the powers of the probate court might extend to the adjusting, and bringing into the joint account, such previous indebtedness. But it is obvious, that it must be done under very great disadvantages,—the debtors themselves virtually representing the creditor also.

We see no reasonable objection to allowing the court of chancery jurisdiction, in all cases of claims in favor of the administrator, or executor, against the estate, as well as *vice versa*. This was in effect determined, in the case last referred to. There is reason and propriety in bringing such claims before some tribunal, where the real parties in interest can be formally allowed to appear. And we do not think the allowance before the commissioners should stand in the way of such re-examination upon the proofs in the case. That was virtually an allowance, obtained while the defendants represented both parties, and could not, in any just sense, be esteemed as possessing the requisite attributes of a judgment of a court of competent jurisdiction, there being a total want of the appropriate parties, and, by consequence, a defect of jurisdiction of the subject matter. These claims must therefore be examined upon the answers and proofs, and, if properly sustained, be *referred to* the master in the court of chancery.

The eighteenth seems to belong to the same class of claims, in principle, as the twelfth. The nineteenth seems to be a charge of holding property from the estate in trust for Cynthia, the intestate's daughter, and selling the property and putting it to the use of Hiram. This charge is against Hiram only. Many of the claims are separate ; but this seems to have a farther objection, that it is no claim

in favor of the intestate, but of Cynthia Ferris, or her heirs, if she have deceased, and should be pursued by the parties in interest. Neither the allegations, or the proofs, establish any trust in favor of Friend Adams, or his estate. If this were a loan to Hiram, or an advancement towards the share of Cynthia, or her heirs, it may be investigated and set right in some proper mode and time, but not here.

The twenty second and twenty third seem to be nothing more, than charges of having received funds, belonging to the estate, during the time the defendants were administrators, which they ought to have accounted for and have not. This is a matter wholly within the jurisdiction of the probate court, and their judgment upon the administration account would be final. And if that judgment were set aside, it would still be a matter exclusively within the jurisdiction of that court, and could with no propriety be brought into the court of chancery. The money received of Twitchell may be in some sense connected with the land, out of which it arose, and will be farther considered in that connection.

The twenty fourth, so far as it is a charge of not making an inventory and appraisal of the *choses in action,* is of no importance in any court. It is seldom done in the probate court, and whether done, or not, is of little importance. The inventory, without the appraisal, could avail little ; and an appraisal could be no more than a remote approximation to the truth. The general charge of squandering real estate, which should have been held *in trust* for the other heirs, is not relied upon.

The twenty fifth seems to be nothing more, than an attempt to apologize for some apparent defects in the plaintiffs' evidence, and to heap upon the defendants' heads some farther particulars of misconduct ; but it is all included in former charges, which have been and will be sufficiently commented upon. The twenty seventh is connected with the twelfth. The twenty eighth is an attempt to charge the defendants with an acknowledgment of trust in writing.

The twenty ninth does not seem to contain any new matter, except as showing, that the plaintiffs have ample redress for most of the matters, contained in this bill, in the probate court, with some farther impeachment of the defendants and the court of probate,— the one for positive perversity, and the other for cowardly shrinking

from duty, if not for positive connivance with the defendants. Sufficient has already been said, to show the opinion of this court in regard to the propriety of the court of chancery extending its powers of guardianship over the probate court, who might in turn be called upon to reciprocate the office to us.

This review of the bill seems to us to have disposed of every thing contained in it, except the land, which it is claimed the defendants either had no title to, or else held as a mere trust, or as an advancement, and the indebtedness existing between the estate and the defendants at the time of the decease of the intestate. It will be necessary, we think, to examine these claims upon the pleadings and the proofs.

In regard to the deeds, the bill charges the matter in almost every imaginable form. The answers, in effect, deny every thing upon this point, which tends to charge the defendants. Some of the grounds, upon which it is claimed, that the defendants are to be made liable, are clearly not tenable,—as that the lands included in these deeds are to be taken as advancement. It is very certain, I think, that, under the Revised Statutes, real estate, to be regarded as an advancement, must be *expressed in the deed to be such,* or else *to be for love and affection.* It is certainly difficult to give the language there used any other reasonable interpretation. And it is almost certain, that the Revised Statutes, upon this subject, were not intended to introduce any new law. The views put forth in the case of *Newell* v. *Newell,* 13 Vt. 24, by the learned judge who delivered the opinion of the court, are in the main, I think, the general opinion of the profession in this and most of the other American states. There may be some difference of opinion, how far the English rule, that a deed, expressed to be for love and affection, may still be shown by parol not to have been intended to be an advancement, obtains here. But all sound lawyers, I think, now concur in the opinion, that a deed, expressed to be for a pecuniary consideration, cannot be made an advancement, by simply showing, that it was in fact executed upon the consideration of love and affection. If that were to be admitted in regard to real estate, it would be placing the proof, in regard to that, upon far more precarious grounds, than what is required in relation to personal estate,—when all just reasons evidently require the contrary. These deeds are all expressed to be

for a pecuniary consideration, except the one to Hiram of one hundred acres in Panton, dated March 14, 1831, and recorded after the death of Friend Adams; and there does not appear to be any charge in the bill applicable to this claim, or any claim under this deed; and if there were, the entire subject of advancement is clearly within the jurisdiction of the probate court, and is now before them, on appeal.

But to examine the answers in detail;—In regard to the Gage lot, the defendants say, that they were in want of pasture land, and made their wants known to their father, and that he made out a deed of this two hundred acres, worth $2000, and that they immediately took possession and have kept possession ever since. They admit, that they paid nothing for it, deny all trust, or agreement to receive it as advancement, and esteem it a mere gift. Considering that this farm was worth from $2000 to $3000 at the time, that the deed was never acknowledged, or recorded, during the life time of the grantor, and that this and other deeds of a very surprising character, which were confessedly supposititious, were, immediately after the decease of the grantor, spread upon the record, it is calculated to excite some apprehension in regard to the entire fulness and faithfulness of the account given by the defendants of the mode and manner, as well as the motives, of this conveyance. The declarations of the defendants, in regard to their own standing in relation to their father's property, at and about the time of his decease, certainly go far to convince any one, that they did not then claim title to this land. And the consideration, that no such pretence was ever set up, or heard of, until after the death of Friend Adams, still farther confirms the belief, that the deeds, put on record at the death of Friend Adams, were in some sense false and fabricated. I do not pretend to have formed any definite opinion, how this deed was obtained, or how early it existed; but I entertain no doubt whatever, that it should be perpetually silenced and buried, as a source of title in the defendants. There is a general aspect about the very account given of it by the defendants, which is too ludicrous to be examined, by any one of ordinary perception of the congruity of things, with a grave countenance,—certainly without a painful effort to preserve a decent and becoming gravity!

This claim and that for the house lot in Vergennes, against Harry

Adams, rest upon very similar grounds. Harry admits, in his answer, that he never paid any thing for this, and says it was an absosolute, unconditional gift. The excuse, which he offers for an inducement to his father to convey the land to him, is certainly such as is not commonly allowed by men, who amass large estates, to deprive them of their possessions, even in favor of their children. It might be a sufficient reason, why the father would suffer his son to occupy it without rent,—but not ordinarily even to that extent. It seems to us, that Harry must have obtained this deed in some way out of the ordinary course, and that his claim under it is not in good faith.

The claim to the benefit of the land levied upon by the Woodbridge execution is certainly somewhat dubious in favor of the defendant Harry, to say the least. But according to his answer, he gave nothing for this execution, except the note to Woodbridge and the bill of cost to Gage,—both of which claims have been allowed in his favor against the estate, if we have not mistaken the proof in the case. And having himself treated the property, as belonging to the estate, in so unequivocal a manner, and claiming it as a gift, without any written evidence, and admitting that nothing was paid, except this, which it is now shown was allowed against the estate, we see no reason, why the land on Snake Mountain should not be held as belonging to the estate,—and also the $100 received of Twitchell. This claim, of itself, is one, which it seems to us might well enough be adjusted in the probate court; but a decree here will save all doubt, and the plaintiffs are allowed to take one, according to the views expressed above.

The only remaining claim, under this head, is for the fifty acres in Panton, against Hiram ; and this is virtually abandoned in the argument. There does not seem to be any ground to sustain this claim, upon the pleadings and proof.

The allowance before the commissioners to Hiram, the $1000 note for borrowed money, which was treated as the credit on the book, the use of the brick store in Vergennes and of the Barnum farm, seem to be the other claims, mainly, which have not been disposed of by the court, or abandoned in the argument, or failed wholly to be sustained in the proof. The use of the Lovell house in Vergennes, by Hiram, might possibly be included in this same category ;

Heirs of Adams *v.* Adams et al., Adm'rs.

but the testimony in the case seems to render it probable enough, that Hiram has rendered some kind of equivalent for the use of that house; and we should not subject any claim to re-examination, unless we felt entirely dissatisfied with the disposition before made of it.

I shall not attempt to go much into detail, in regard to the proof upon these points. In regard to the $1000 borrowed, and for which it was claimed the $1000 note was given, which it was claimed to set aside wholly upon the ground, that the same sum was credited on book, it is obvious, that the defendants' answer cannot be allowed to have any such effect. The credit, of itself, is sufficient to establish a claim for $1000 in money, and the note another $1000, and both should be allowed, unless satisfactory evidence, aside from the answer, can be adduced, to show that they were really one and the same thing. The interlineation of "sheep" should not be allowed to defeat the credit, unless the right to make the alteration is established by proof *aliunde.* These rules are very obvious. The intestate did rely upon this note, and no doubt would equally rely upon a credit on the defendants' book, which must be presumed to have been made with his concurrence, and certainly will be presumed to have been for a *different* thing. Clearly, then, no alteration of the book, which the parties, for the purposes of the credit, had constituted the depositary of their evidence of debt on the part of the defendants, and in which both would consequently have such an interest, that neither would be justified in altering it, without the consent of the other, any more than they would a written contract between them, can avail the defendants. So, too, in regard to admissions, or declarations, of the defendants, put into the case by the plaintiffs, which are in some sense responsive to the bill, and which are favorable to the defendants,—they are not beyond the control of the court, and are not to be received to do away written contracts, or credits on book, but, like similar admissions in trials at common law, are indeed evidence, but not conclusive. The triers may believe and act upon so much, as operates against the defendants, and reject the other portions.

It is, indeed, questionable, whether, when the plaintiffs' claim rests upon a written contract, or admission, and the defendant is called upon, in the bill, to admit, or deny, its existence, and does admit it,

which makes a full case for the plaintiff, the defendant can go farther, and show, that it is not now of binding obligation upon him. The opinion of Chancellor KENT, in *Hart v. Ten Eyck*, 2 Johns. Ch. R. 62, restricts the rule, as to the defendant's right to discharge himself, when he is only charged by his admission in the answer, to the very same sentence, and to the same transaction. This case was, indeed, reversed in the court of error upon this point, as stated in a note to *Woodcock v. Bennett*, 1 Cow. 744, where the rule is laid down, which is substantially followed in the later cases in that state, that whatever is fairly a reply to the general scope of the claim set up in the bill, whether in the stating or charging part, and whether by way of denial, or excuse, or avoidance, is to be treated as evidence for the defendant. This is far more rational, and just, and easy of application, than the restricted rules contained in the case of *Hart v. Ten Eyck*; but I am not sure, that it is yet fully established.

All writers and all the cases state the *rule* upon this subject alike, to wit, that what is responsive to the bill is evidence for the defendant, and what is not responsive is not. But in applying the rule there is almost infinite diversity. But I think this may be considered as settled, that where the plaintiffs' claim, as set forth in the bill, rests upon a written contract, and the right of action is not barred by lapse of time, the admission of the contract and the allegation of payment, or of any other matter merely in discharge, are to be treated as distinct, and the latter must be proved, in order to avail the defendant; but on the other hand, if the claim of the plaintiff rests wholly in oral proof, and the answer of the defendant is invoked, to make out the plaintiff's case, the defendant may admit such a contract, and allege that it was in its inception inoperative, or that it has been subsequently paid, or released, and the whole answer, upon both points, is to be regarded as evidence; although many, perhaps a majority, of the cases contradict this latter proposition, and most of the elementary books say, that the matter of avoidance, in order to be evidence, must be contained in the " *same sentence.*" 2 Daniel's Ch. Pract. 1426. *Ridgeway v. Darwin*, 7 Ves. 403, and note by Mr. Sumner. *Thompson v. Lambe*, Ib. 587. The same rule is adhered to in *Robinson v. Scotney*, 19 Ves. 582; but the party was there relieved, by being permitted to put his answer in a different *form*,—just as if the form of the allega-

tion should make any difference ! The reporter's note to this case seems to me to hint at the true ground of limiting the responsiveness of the defendant's answer. He says, " Charge by admission discharged only by showing the application immediate on the receipt of the money, *as one transaction, not by distinct, independent items on the other side of the account.*"

The old rule, which dates as far back as *Kirkpatrick* v. *Love,* Ambl. 589, that, if the discharge was in the *same sentence* with the admission, it would avail the defendant, otherwise not, seems now almost wholly abandoned, as resting in no sound reason. Lord HARDWICKE, in *Talbot* v. *Rutledge,* 4 Bro. C. R. 74, very boldly condemns the chancery rule *in toto,* and approves the rule at common law, as stated above, which is obviously the only sensible one. And I understand Chancellor KENT, in *Hart* v. *Ten Eyck,* to contend for a distinction, in regard to the effect of the testimony of a defendant in chancery, whether it is contained in the answer, or is given before the master ;—p. 88. There may be something in this distinction, but I find it *no where else* alluded to, and I confess myself unable to comprehend its force.

I think the rule, which obtains at law, that the whole admission, with all its qualifications, whether of avoidance, or discharge, shall be received and considered as evidence, although you are not of course bound equally to believe all parts of it, but may charge the party upon his admission, and refuse to believe what he says in his excuse, and which is so decidedly approved by Lord HARDWICKE, in *Talbot* v. *Rutlege,* and by Lord ERSKINE, in *Ormond* v. *Hutchinson,* 13 Ves. 54, is the only sensible rule, and the one the courts of equity will finally be compelled to adopt. It is the one virtually adopted in the state of New York, but not fully, I admit, in the English chancery. It is the rule as to reading an answer, in one case, as evidence in another case, either at law, or in equity,— with this qualification, that by reading one part of an answer you open the door to the other party to read the whole ; but the effect is still an open question to the triers,—and always applies to an answer to a bill of discovery merely; and Chancellor KENT, in *Hart* v. *Ten Eyck,* seems to think the rule, for which he contends in equity, to be similar to the one at law, wherein the party is entitled to have *all,* that he said *at the same time,* given in evidence. But

the rule for which he contends is, that he must not only say it *at the same time,* but in the same sentence, and it must have reference to the *identical transaction.*

This rule must, to be consistent, either stop at the very point, where the defendant makes himself chargeable, or it must admit all that is said in regard to that particular indebtedness.   Whether the party discharges himself in the *same sentence,* or after the intervention of a period and a capital letter, is of no importance to the rule of pleading, or evidence.   And whether the payment was the same day, or the next, or the next week, or month, or year, is of no possible import whatever.   The only inquiry is, whether the receipt and the payment are stated in the answer as part and parcel of the same transaction, and whether the real *admission,* intended to be made, and the only one that was or would have been made, was the *compound result* of both receipt and payment.   I can readily conceive a case, where the matter offered in discharge is so remote, that it should not be esteemed, perhaps, a qualification of the admission ; but ordinarily, I apprehend, it should be so esteemed, and, whenever good sense and sound reason prevail, will be so esteemed. It is certainly so at law.   There is no reason to doubt, that it was equally so in trials in the civil law.  But, for some reason, the court of chancery has seen fit to engraft a still farther refinement upon the old rule.

This has sprung, I believe, from viewing the answer as a mere plea, and nothing more.   But it is really a matter of evidence, so far as it is fairly an answer to the bill.   If the bill, in order to be good against a demurrer, must allege not only the receipt of the money, but that the defendant still retains it in his hands, I do not well see, why the reply to the former is more responsive to the bill, than the latter.   And if a simple denial, that the defendant still detains the money, would be considered evasive, as it most undoubtedly would be, and the defendant be required to answer farther, and set forth when and where and to whom he paid it, I do not, I confess, well comprehend, how the answer, which the defendant is compelled to give, is to be regarded as not responsive to the bill.

But the rule in the court of chancery is no doubt somewhat more limited, at present, than this.   The language of Lord ERSKINE, in *Ormond* v. *Hutchinson,* seems to indicate an approach to this rea-

sonable extension.   " He (plf.) cannot, reading the answer as to the
" contract and consideration, stop at the end of a sentence, but
" must proceed to the end of the immediate subject, to which the
" defendant is answering ; as at law a witness cannot be stopped,
" when the party, wishing to elicit from him particular facts, finds
" it convenient to stop him, but must be allowed to finish the par-
" ticular subject, and to proceed to state any thing with reference to
" it.   Otherwise the party might obtain an advantage, stopping the
" evidence just at the qualification.   But that does not apply to dis-
" tinct matter."   But this rule could have no such application, as to
enable the defendant to defeat a written contract by his own testi-
mony ; for that is, in no just sense, a *qualification* of his admission,
and that is the true limit, perhaps.   This claim will therefore be re-
ferred to the master, so far as it has not already been allowed in the
probate court,—which is, I understand, the note of $1000 against
Hiram, the credit having been allowed at $1000, and the sheep at
$741.

As it regards the allowance before the commissioners in favor of
Hiram, it will be set aside by the court of chancery, and the whole
matter of Hiram's indebtedness referred to a master.   This deter-
mination is made upon the ground, that the matter has never been
properly adjudicated, where all parties in interest could appear and
he heard,—the debtor and creditor being in fact represented by the
same person,—and upon the farther consideration, that this court
are fully satisfied, that no such sum was due to Hiram.   We are
satisfied of this from the fact, that the intestate was a man of great
pecuniary means, and Hiram of comparatively none at all ; that in
Hiram's business, and with his means, he would be far more likely
to borrow money, than to lend, especially of his father.   The fact,
too, that in July, 1837, he gave to Friend Adams his note for
$1130,50, for other notes which he then took up, and for doing
which it is impossible to conjecture any reason, while he held all
this bundle of notes against Friend Adams, which have since been
allowed by the commissioners, running back to 1831, which, if the
allowance is fair, he must then have held, induces us to believe,
there must have been some mistake in the matter, and therefore to
subject it to farther investigation.

The rent of the Barnum farm, before the death of Friend Adams,

will be referred to the master, both as to Harry and Hiram.   It is
possible the father might have intended they should occupy this
farm without rent, but it does not appear probable to us.   The master
can determine.   The defendants will have the full benefit of their
own testimony in regard to that; and if, notwithstanding that, the
master believes they formed unreasonable expectations as to the
purposes of Friend Adams, he will make them chargeable with the
use of the farm.   The same, also, as to the brick store.   It seems
to me more probable, that this might have been intended to be rent
free, in consideration of assistance rendered by the defendants to
Friend Adams, and of some advantage he might derive from his
sons being in the store;—but of this I am not satisfied,—the report
of the master will determine.

This disposes, we think, of all of that portion of the bill, upon
which it seems to us the plaintiffs can prevail.   It has cost great
labor and expense to bring the matter to trial, and to examine and
decide it.   Beyond the mere apology for our own wanderings in
the case, we are not disposed to complain of the countless mass of
irrelevant matter, with which this case is surrounded.   The decree,
which the orators obtain, is of sufficient importance to justify the
proceeding; and the nature of the case is such, that it was, no
doubt, difficult to know in advance precisely how to frame the bill,
which accounts for the manner in which the bill is drawn;  and the
plaintiffs will recover costs upon those portions of the bill and evi-
dence, where they have prevailed, and pay costs where they have
failed.

The decree of the chancellor is reversed, and the case remanded
to the court of chancery, with directions to that court to enter up a
decree for the plaintiffs, perpetually enjoining the defendants from
setting up any title, in law, or equity, to the Gage lot, and requiring
them to inventory the same as part of the estate of Friend Adams,
and to render an account of all rents and profits of the same before
the decease of Friend Adams, before one of the masters of the court.
The same as to the Snake Mountain land, upon which the Wood-
bridge execution was levied, and the $100 received of Twitchell,
and the house and lot in Vergennes,—except that for this the de-
fendant is not required to pay rent.   And the claim for the $500,
for that portion sold to Hill & Hapgood, will be referred to a mas-

ter to state the sum due, and the orators will have a decree for the same;—and also the claim for the use of the brick store, if any thing is reasonably due to the estate for the use of the same, under the circumstances. The allowance by the commissioners in favor of Hiram is to be perpetually enjoined from being used by him, either in law, or equity; and the whole matter of indebtedness between him and the estate, including the use of that portion of the Barnum farm occupied by him until the decease of Friend Adams, is to be referred to a master to state the sum due. It shall also be referred to a master, to state how much is due from Harry, if any thing, for the use of a portion of the Barnum farm.

Whatever sums are found due from the defendants, they shall be required to charge themselves with in their administration account before the probate court, and sums found their due shall be credited to them in that account.