J. S. Brittain Dry Goods Company *et al.*, Appellees, v.
J. E. Plowman, Appellant.

Fraudulent Conveyances: ESTABLISHED. G. was the owner of a
stock of goods in the town of M., and applied to defendant his
brother, for a loan. Defendant came two hundred miles to look
at the goods, which G. represented to be worth five or six
thousand dollars, but took no invoice of them, and made no in-
quiry as to incumbrances. Defendant and G. went to a town
24 miles west of M., where a mortgage on G.'s stock was drawn
up by a lawyer unknown to each of them, which defendant at
once recorded. No part of the money was paid to G.'s creditors,
though they were urging payment. *Held*, that a finding that
G. executed the mortgage with intent to defraud his crediors
was proper.

Notice to buyer. The circumstances, with the knowledge that the
creditors of his brother were pressing him were sufficient to
put defendant on inquiry as to his brother's intention to de-
fraud his creditors, and, hence, to defeat defendant's rights
as an innocent purchaser.

*Appeal from Clarke District Court.*—Hon. H. M. Towner,
Judge.

Saturday, April 13, 1901.

Several creditors of G. W. Plowman in actions
against him caused writs of attachment to be levied on his
stock of goods. J. E. Plowman intervened in each of these
actions, claiming the attached property under a mortgage ex-
ecuted June 8, 1898. Answers thereto were filed, alleging
the mortgage to be fraudulent. Later the J. S. Brittain Dry
Goods Company, having obtained judgment, began suit in
equity to set aside the mortgage because executed in fraud
of creditors, in which issues were joined, and on motion the
other actions were consolidated therewith. Enough goods
were sold, through a receiver duly appointed, to satisfy the
demands of the creditors, with costs, and the remainder
turned over to the mortgagee. On hearing, the mortgage was

held to be fraudulent, and J. E. Plowman, the mortgagee, appeals.—*Affirmed.*

*Sullivan & Sullivan* for appellant.

*Temple & Hardinger, Jamison & Park,* and *McIntire Bros.* for appellees.

Ladd, J.—The stock of goods in controversy seems to have been obtained by G. W. Plowman in exchange for his farm, and soon after engaging in the new enterprise he discovered the need of money to pay the balance of the purchase price. To obtain this, he visited his brother, a farmer owning 400 acres of land near Holden, Mo., and with him arranged to obtain $1,375 from the bank at that place. A note of $1,500 was executed to the bank, with the brother (the appellant) as surety; the difference being retained as interest. In the following June he again visited appellant, and, according to the latter's story, to borrow another $1,500 with which to pay his creditors. At that time the note referred to, though not due for six months, was, at appellant's request, renewed; and the latter borrowed from the bank $1,440 more for which he alone executed a note of $1,500. Undoubtedly he represented to the banker that he was hiring this for G. W. Plowman, and, in answer to inquiries, represented that he was going to examine the stock of goods and take a mortgage thereon as security. The money, instead of a draft as on the first note, was taken and retained by the appellant until he should satisfy himself as to the value of the security represented by its owner to be worth from $5,000 to $6,000. He then went by way of Kansas City to Murray, Iowa, a distance of more than 200 miles, reaching there in the night of June 7th. The following morning he looked at the stock, unaided by his brother, though asking a few questions of the clerk in charge; took no invoice; examined none of the bills payable; made no estimate of values, nor inquiry concerning extent or char-

acter of the business transacted.  Before noon he left on the train for Creston to meet G. W. Plowman, who had driven by team out of Murray one or two hours before, but who reached Creston by train.  It is said he proposed going to Afton, but appellant preferred Creston; and it is also explained that the former had business in that direction, though appellant was not allowed to know its character.  They happened to meet at Creston, and had an attorney whom neither knew draw the mortgage, which was executed; but not until after leaving the office did appellant venture to intrust his brother with the money.  He took the precaution to turn it over when in the open hallway, rather than in the attorney's presence, as he did not wish people to see his brother take so much money.  Thereupon he lost track of G. W. Plowman, but at once took the train for Osceola, where the mortgage was recorded, and he does not know which returned to Murray first.  We stop here long enough to observe that instead of going directly to Osceola, 10 miles east of Murray, where all of this business might have been transacted, these parties chose to go 24 miles west, to Creston, and appellant then returned through Murray to Osceola to complete it !  No investigation had been made with respect to the incumbrances, nor concerning the character or amount of the debts of G. W. Plowman, and no understanding was had as to the time of their payment.  Appellant claims only to have had the assurance that the amount loaned would about pay out the debts.  Having accomplished the object of his trip, the plaintiff returned to Missouri the following morning.  He paid all of his traveling expenses and for recording the mortgages, though loaning the money borrowed without profit.  G. W. Plowman was not called as a witness, though diligent effort was made by the sheriff to serve a subpœna upon him in behalf of his creditors.  To the latter he paid nothing, and a few days later the goods were attached and involved at a valuation of less than $3,000.  Upon learning this, the appellant informed the

banker àt Holden, to whom he executed a mortgage on his land, securing the payment of the two notes. Upon this evidence the court was certainly authorized to find G. W. Plowman's purpose in executing the mortgage fraudulent. The fact of his misrepresentation of the value of the stock, the course taken in giving the mortgage, together with the failure to use any of the alleged proceeds in payment of his creditors, can lead to no other conclusion. This being true, no attention need to be given to evidence of his declarations made several days after the sheriff had taken possession of the goods under the writ of attachment. But see *Turner v. Hardin,* 80 Iowa, 691; *Thomas v. McDonald,* 102 Iowa, 571. But should appellant be held to have participated in such purpose? His failure to call the mortgagor as a witness is certainly ground for an unfavorable inference against him. This brother whom he claims to have befriended at such trouble and expense to himself was within easy reach, and may be assumed, in view of the transaction between them and their relationship, to have been ready to confirm his story if true. The circumstance that he was not called upon to do so is in nowise explained. Says Mr. Bump, on this subject, in his work on Fraudulent Conveyances: "He cannot be altogether relieved from this duty, although he is illiterate. The facility with which a fictitious payment may be fabricated renders it necessary for him to produce all the proof which may reasonably be supposed to be in his power of the reality and fairness of the transaction, and the want of clear proof is evidence of fraud. The grantee need not prove the payment of the consideration until the fraudulent intent of the grantor is shown, but when that is shown it is incumbent on him to establish the payment by competent evidence, for the proof is almost exclusively within his knowledge." See *Glenn v. Glenn,* 17 Iowa, 503. Had appellant paid this money over to his brother, and taken security in reliance on the latter's representation, he might be looked upon as acting the part of the unsophisticated person counsel picture him.

But instead he hired money without any conversation as to
rate of interest, agreeing to loan it to his brother at 8 per
cent. per annum, traveled over 200 miles to investigate the
security, and upon his arrival accepted the mortgage with-
out inquiry. Though reloaning the money borrowed by him
without any profit, he not only took the trouble to travel this
distance, but paid all expenses incident to the trip, includ-
ing the recording of the mortgage, without thought of charg-
ing these to his brother. Though the mortgage could have
been prepared at Murray or at the county seat, but 10 miles
distant, they chose to go the other way 24 miles, to Creston,
and to have appellant return alone through Murray on to
Osceola to have it recorded. With all his solicitude as to
the security, he made no investigation with respect to in-
cumbrances. Careful to carry the money instead of a draft,
as his brother had previously done, and which might be
traced, he chose to turn it over to the mortgagor, not at
Murray or the lawyer's office, but in the hallway of a dis-
tant building, when the two only were present. It
is at least doubtful whether the last money hired
was ever paid to the mortgagor, but, regard-
less of whether this was done, the circumstances were such
as to put appellant, as an ordinarily prudent man on inquiry
concerning the purpose of G. W. Plowman in executing the
mortgage. The amount of the mortgage, as compared with
stock on hand; the failure of the mortgagee to render any
aid in ascertaining its value; his insistence on going to Afton
or Creston to execute the mortgage, instead of at Murray
or at the county seat, where it must be recorded, giving as
his excuse that he had business in that direction, without
explaining it; leaving Murray alone by team, instead of
traveling with appellant by team or rail,—these, together
with the evident fact that creditors were pressing G. W.
Plowman for payment, which he must have known, were
enough to lead an ordinarily careful person, situated as ap-
pellant was, to investigate the intention with which the

mortgagor was acting, and thereby put him on inquiry, if not sufficient to establish his direct participation. We are content with the decree as entered.—AFFIRMED.