JOHN HICKEY, WM. P. HICKEY, JR., by his next friend, MARY HICKEY, v. R. P. DAVIDSON, WM. C. BROWNING, and R. M. ELLYSON, Sheriff, Appellants.

**Appeal:** DELAY IN FILING AMENDED ABSTRACT: ARGUMENT: MOTION TO
1 STRIKE. Where the submission of a cause on appeal was postponed, after the filing of the abstract and arguments, until the determination of another action involving like issues as affecting one of the parties, an amended abstract and reply argument by appellees filed in time to permit further argument by appellants, which are an aid to the court in determining the case, will not be stricken because of delay in filing the abstract and for the reason that the reply was largely a reargument.

**Estates of decedents:** SALE OF HEIR'S INTEREST: ADVANCEMENTS:
2 EVIDENCE. Where a father and son enter into a valid agreement to cancel a debt of the latter in consideration that the son surrender all claim to an interest in the father's estate, the entire estate upon the father's death intestate vests in his other heirs, and any apparent interest such son may have therein is not subject to sale on execution at the suit of his creditors. Evidence reviewed and held sufficient to establish such an agreement.

**Fraudulent conveyances:** EVIDENCE. Where a son had exhausted
3 his interest in his father's estate by advancements made to

him, so that upon his father's death he was practically insolvent, the act of the other heirs in conveying their interest in a portion of the estate to the infant son of the insolvent brother, though unexplained, did not show a general fraudulent purpose on the part of all to defraud the creditors of the insolvent. Deemer and Sherwin, JJ., dissenting.

*Appeal from Cedar District Court.*— HON. W. G. THOMPSON, Judge.

WEDNESDAY, JANUARY 17, 1906.

ACTION by plaintiffs, claiming to be the owners in common of a tract of land, to restrain the sale thereof by defendant Ellyson, as sheriff, under execution issued under a judgment rendered in favor of defendant Browning against one Wm. P. Hickey and assigned to defendant Davidson. Decree for plaintiffs, from which defendants appeal.  *Affirmed.*

*Grimm, Trewin & Moffit,* for appellants.

*Wright, Leech & Wright,* for appellees.

MCCLAIN, C. J.— In a motion submitted with the case appellants ask that appellees' amendment to the abstract and a considerable portion of the reply by appellees to appellants'

1. APPEAL: delay in filing amended abstract; argument; motion to strike.

argument be stricken from the files, because the amended abstract was filed a long time after the filing of appellants' argument (appellees having the opening and closing in this case) and the reply is in the main part a reargument.   In an ordinary case we should be inclined to sustain this motion, but the facts of this case are peculiar.   After the filing of the abstract and arguments the submission of the case was postponed until another case, involving the interest of plaintiff Wm. P. Hickey, Jr., in this same tract of land, should be decided by this court.   After the decision in the other case

was rendered the appellees conceived it to be to their interest to present the record more fully by way of amendment to the abstract, and to more fully argue the questions which had been involved in the other case, and the amendment to the abstract and the reply argument were thereupon filed in ample time to enable the appellants to file further argument, did they deem it advisable. As the record is at best somewhat obscure, and, even with the amendment, is quite brief, we have desired to avail ourselves of every assistance in understanding it, and have reached the conclusion that the motion to strike should be overruled.

One John Hickey died intestate in March, 1901, owning one farm of 252 acres, which will hereafter be designated as the "Home Farm," another farm of 120 acres, consti-

2. ESTATES OF DECEDENTS: sale of heirs' interest: advancements: evidence.

tuting the tract of land to which the present case relates, two town lots, and some grain, live stock, implements, and household furniture. He also held at the time of his death a note for $7,500, signed by the firm of Hickey & Kane and by the individual members of the firm, one of whom was his son Wm. P. Hickey, secured by chattel mortgage on a stock of goods which had belonged to the firm. So far as the record discloses this constituted his entire property. He left surviving him as heirs five children, John Hickey, one of the plaintiffs, Wm. P. Hickey, already referred to, and three daughters. Soon after the death of their father, the three daughters joined in a conveyance of the 120-acre tract of land to their brother John Hickey and their nephew Wm. P. Hickey, Jr., son of Wm. P. Hickey above referred to; and thereafter the plaintiffs in this case, the grantees in the conveyance from the three daughters, brought this action to enjoin the defendants from selling a one-fifth interest in this tract as the property of the judgment debtor. Counsel agree that the whole case depends on the solution of the question whether Wm. P. Hickey, Sr., had any beneficial interest in his father's estate which can be subjected to the payment of

the judgment under which defendants claim the right to seize an interest in this property.

There is no dispute between counsel as to the law applicable to the case, nor is there any direct conflict in the evidence as to any material fact, but the difficulty in reaching a conclusion arises from uncertainty, as appears from the conflicting claims of counsel, with regard to inferences or deductions to be drawn from the testimony of the witnesses, all of whom were examined in plaintiffs' interest. It is conceded that Wm. P. Hickey, as heir, appears to be the owner of a one-fifth interest in the tract of land to which this controversy relates, and that the plaintiffs' appear to hold the title to only four-fifths of the tract as against creditors of Wm. P. It is clear, then, that the burden is on the plaintiffs to overcome the presumption of ownership of a one-fifth interest by Wm. P. Hickey, in order to entitle them to relief as against the defendants. This burden plaintiffs have attempted to sustain by evidence which, as their counsel claim, establishes the fact that prior to the death of John Hickey his son Wm. P. Hickey was indebted to him to an amount in excess of the share to which Wm. P. would become entitled as heir on the death of his father intestate, and that under these circumstances they entered into an arrangement by which the indebtedness of Wm. P. to his father was treated as an advancement and canceled, and all claims of Wm. P. to share in his father's estate were surrendered and extinguished.

The question before us to decide is whether there was such an arrangement, for, if such a valid arrangement was made, then on the death of John Hickey all his property, not including the claim against his son Wm. P., which was extinguished by the arrangement, vested in his other four children and nothing remained subject to be taken by defendants under the judgment against Wm. P., and whatever apparent interest Wm. P. had in the 120-acre tract of land as heir was apparent only and not real, having been extin-

guished, as above indicated, by the settlement between him and his father.    So far as it is necessary to determine the fact in this case, the alleged indebtedness of Wm. P. to his father consisted of money loaned by father to son, and invested by the latter in the partnership business of Hickey & Kane, and was evidenced by the $7,500 note secured by chattel mortgage above mentioned.    Counsel argue that the indebtedness of Wm. P. to his father was greater than this at the time it was converted into an advancement, but it is sufficient for present purposes to consider this one item, as to which there is no dispute.    On the other hand, it is conceded that at the time of the arrangement between Wm. P. and his father there was $1,800 interest accrued and unpaid on this $7,500 note, so that, if there was such an arrangement, the indebtedness which was converted into an advancement was at least $9,300.    Some claim is made in argument that no interest accrues on money given by way of advancement; but there is not the slightest evidence that the money furnished Wm. P. or the firm of Hickey & Kane was considered on either hand as given by way of advancement to Wm. P. until the arrangement referred to was made. The indebetdness was evidenced by a note secured by mortgage, interest was provided for, and there was every characteristic of a loan.

There is no controversy between counsel as to the proposition that an indebtedness may, by mutual agreement, be converted into an advancement.    The only question is as to the sufficiency of the evidence to show such an arrangement between Wm. P. and his father in this case.    But there can be no doubt under this record as to the sufficiency of the evidence on this point.    Wm. P. testified to the fact and it is shown by one of his daughters and another witness that just before such arrangement was made, as testified to by Wm. P, the father had caused the daughter to write a letter to Wm. P. in response to one asking for more money, in which it was specifically stated that Wm. P. had already

received more than his share, and no further money would be furnished to him. The letter, as testified to, did not in itself contain a definite statement that the father would treat the indebtedness already existing as an advancement, but it did indicate a feeling on his part toward his son Wm. P. with reference to the indebtedness which would tend to corroborate the testimony of Wm. P. as to the conversation between him and his father which he says soon afterward took place.

Unless we are justified in absolutely disbelieving and disregarding the testimony of unimpeached witnesses, we are not warranted in saying that there is not sufficient evidence to show the conversion of the indebtedness into an advancement. What was subsequently done by the parties in interest indicates their understanding that such an arrangement was made. Soon after the death of the father, and without further conferance with his brother and sisters, Wm. P. executed to his sisters a conveyance of his interest in the 252-acre farm which included the homestead, joining for the purpose, as we understand the record, in a deed which also conveyed the interest of his brother John; and in connection with the execution of this conveyance the $7,500 note, which was in the hands of one of the daughters, was surrendered. No attempt appears to have been made by his brother and sisters, as the other heirs and jointly interested in the personal property, to enforce this obligation against Wm. P. or to treat him as in any way a debtor to the estate. It also appears that Wm. P. joined with his brother John, in transferring to his sisters without further consideration all their interest in the personal property. The entire record can be consistently explained (in the absence of an inference of fraudulent collusion, to which matter we shall presently refer) on the theory that all the heirs perfectly well understood that Wm. P. had no further interest in his father's estate.

As bearing on the credibility of the testimony of Wm. P.

that there was an arrangement between him and his father
by which his indebtedness was converted into an advancement,
we may properly consider the value of the estate as compared
with the acknowledged indebtedness of Wm. P. to his father.
Without going into details, we have reached the conclusion,
on reading the evidence, that it appears without reasonable
doubt that the total value of the estate, real and personal, not
including the indebtedness of Wm. P. to his father, was at
the time of his decease $33,650.   Adding to this the amount
of the indebtedness of Wm. P. to his father to find the total
value of the estate in which Wm. P. would have been en-
titled to participate (subject to the offset against his interest
of his indebtedness), we have the total value of the estate
·$42,950.   The share of Wm. P. as heir would therefore
have been, had no arrangement been made to convert this
indebtedness into an advancement, $8,590.   The share of
Wm. P., therefore, was clearly  less than his indebtedness,
and yet not so different from it in amount as to render the
action of the father in canceling it and converting it into an
advancement unreasonable.   Were there no claims of credit-
ors against Wm. P., there would be no grounds for question-
ing the reasonableness of the testimony of Wm. P. as to the
arrangement between him and his father.

P., and the subsequent acts of his sisters in conveying an
3. **FRAUDULENT** interest in the 120-acre tract to the infant son
**CONVEYANCES:**
**evidence.** of their brother, taken together, show a general
fraudulent purpose on the part of all of them to put the
property of Wm. P. beyond the reach of his creditors.   We
concede that courts should be astute to discover fraud, and
should strenuously endeavor to prevent the success of a dis-
honest effort to so manipulate the title to property that cred-
itors shall be deprived of just satisfaction of their claims;
but we do not conceive it to be within the province of a
court of equity to infer a fraud from acts which are equally
consistent with good faith, nor disregard the testimony of
unimpeached and uncontradicted witnesses.   It was not un-

reasonable, nor on the face of it, necessarily fraudulent, for the sisters of Wm. P. to provide for his infant son in view of the fact that he had lost all his property in an unfortunate business speculation. Even if they saw fit out of their abundance to make some provision for this brother, and to make that provision by giving property to his infant child, which would therefore be beyond the reach of his creditors, the creditors cannot complain.

Counsel dwell upon the fact that no explanation has been made in the record as to why the sisters conveyed an interest in this 120-acre tract to the son of Wm. P. instead of to him. But, as we look at the case, such explanation was uncalled for. If Wm. P. still had a real interest, as he had an apparent interest in this 120-acre tract, the conveyance would simply pass to his son the additional interest held by the daughters therein; and the question to be determined by the court was, not the intention of the daughters, but the subsisting interest, if any, of Wm. P. Had his sisters conveyed their interest directly to Wm. P., it would simply have invested him with their interest in addition to his own, and they would thereby have been giving him their own property to be taken by his creditors in satisfaction of his debts. There was certainly no badge of fraud in a transaction by which they vested their own interest in his son instead of in himself.

Some claim is made in argument that there was after the death of the father a practical partition of the property among the brothers and sisters, in pursuance of which, and for the purpose of defrauding the creditors of Wm. P., the share of the latter was conveyed to his son instead of to himself. But there is no evidence of any arrangement for partition, and what was done was not consistent with any such arrangement. The value of the one-half interest in the 120-acre tract, which the sisters purported to convey to their brother's son, did not correspond to his interest in the estate, disregarding his indebtedness or advancement, nor to his in-

terest in excess of such indebtedness or advancement. The surmise as to the attempted partition is wholly inconsistent with all the evidence as to the acts of the parties and the value of the property.

We therefore reach the conclusion that Wm. P. Hickey had no interest in the 120-acre tract of land which the defendents sought to reach under execution, and that the decree of the trial court quieting the title of the plaintiffs, and enjoining the defendents from levying upon any interest in the property under the judgment against him, was correct; and it is *affirmed*.

DEEMER, J. (dissenting).—The law applicable to this case is well settled, and the facts are not seriously in dispute. The difficulty, as I understand it, is in the application of the law to these facts and with the final conclusion reached by the majority. The case is this:

Before the death of his father William P. Hickey, Sr., was largely in debt and practically insolvent. He owed various parties something like $14,000, and the defendants are of these creditors. John Hickey, Sr., father of William, died March 11, 1901, leaving surviving five children, to wit: William P. Hickey, Sr., John Hickey, Jr., Maggie and Nellie Hickey, and Mary O'Connor. There is some dispute in the evidence, or rather some doubt regarding the character and value of the property which John Hickey, Sr., owned at the time of his death. It is conceded, however, that he died seised of 372 acres of land in Linn county, two town lots, a large amount of personal property worth at least $4,300, and cash to the amount of $900. Some other property, hogs, cattle, horses, harness, and household furniture, was also left, the value of which is not shown.

A few days after the death of John Hickey, Sr., and before any administrator was appointed, or any appraisement made of the property belonging to the estate, and without any computation being made in order to determine what

amount each of the heirs was entitled to, the two men, William P., Sr., and John, Jr., heirs of their father, John, united in a deed to their sisters, Maggie and Nellie Hickey and Mary O'Connor, conveying to them all their interest in 252 acres of the land owned by the deceased, and the two town lots; and they also conveyed to them by bill of sale all their interest in all the personal property left by the deceased. On the same day, and as a part of the same transaction, the three women heirs of the deceased united in a deed to William P. Hickey, Jr., a six year old son of William P., Sr., and to John Hickey, Jr., conveying to them their undivided three-fifths interest in the remaining 120 acres of land left by the deceased, which is the subject of controversy in this case. It is not only conceded, but shown, by the evidence beyond all dispute that William P. Hickey, Jr., paid nothing for the land; that is to say, that he furnished no part of the consideration therefor. Remembering that these conveyances were made almost immediately upon the father's death, that William P. Hickey, Sr., was insolvent and largely in debt when his father died, that no administration was had or attempted upon the father's estate, that the women conveyed to William, Jr., and John, Jr., their three-fifths interest in and to the 120 acres of land, that there was no settlement or accounting between the parties to these conveyances, and nothing said between them, according to their testimony, about what each one was to receive from the father's estate, we have, I think, about as strong a *prima facie* case for the creditor of William P. Hickey, Sr., who held a judgment against him at the time of the father's death, as it is possible to present to a chancellor. See *Sargent v. Chubbuck*, 19 Iowa, 37; *Roundtree v. Davidson*, 59 Wisc. 522.

It is well settled that the law operates upon the conveyance and not upon the estate transferred, and the creditor will take all the estate which the debtor has at the time when they impeach the transfer, and not merely the interest trans-

ferred. Bump, Fraud. Conv. section 476; ·*Flynn v. Williams,* 29 N. C. 32; s. c., 23 N. C. 509.

What is the law under such a state of facts? `A conveyance of land made with intent to hinder, delay, or defraud creditors is always regarded as invalid, and existing creditors may have such conveyances set aside and the property subjected to their claims, or they may disregard the conveyance and levy upon the land so fraudulently conveyed. Moreover, if one has the beneficial interest in a piece of property, then, no matter in whose name the title may be, the holder of that title is regarded as a trustee, and the property may be reached by the creditors of the real, the beneficial, owner. *Doolittle v. Bridgman,* 1 G. Greene (Iowa) 265. When one furnishes the consideration for property, title to which is taken in the name of another, a resulting trust immediately arises, and he who furnishes the consideration is regarded as the true owner, and the property may be levied upon and subjected to the claims of his creditors. Bearing in mind that William P. Hickey, Jr., furnished none of the consideration for the transfer of the land to him, and looking to the transaction as it is, undisguised by any surmises or inferences, it is clear to my mind that William P. Hickey, Sr., furnished the consideration for the conveyance to his six year old son, and that a resulting trust immediately arose in his favor. *State Bank v. Harrow,* 26 Iowa, 426.

I cannot forbear the suggestion, in this connection, that, if this be not true, William Hickey, Jr., has a very precarious title, for the grantors in his deed did not undertake to convey more than a three-fifths interest in the land. If they in fact had a three-fourths interest, it is important to inquire where is the title to the other three-twentieths, which they did not pretend to convey. Why did they convey a three-fifths interest in the land to William P., Jr., and to John, Jr.? The answer is, because they regarded John and William, Sr., as holding the other two-fifths in-

terest. Why did William, Sr., join John, Jr., in a convey-
ance of his interest in the other property, and in the bill of
sale, if he had no interest in the property or any part of it?
Answers to these questions from the record in this case solve
the question now before us, and to my mind demonstrate that
William P. Hickey, Sr., and he alone, furnished the con-
sideration for the conveyance to his six year old son. If
this be true, there is no doubt that the creditors of William
P., Sr., may subject that interest to the payment of their
judgments. But there is also another kind of conveyance
which creditors may avoid, one quite commonly met with
when a person attempts to cover up his property and hide
it from his creditors. That is a conveyance upon secret
trust. From a careful reading of the record in this case I
am satisfied beyond all doubt that this conveyance to Wil-
liam P. Hickey, Jr., the six year old son of William P., Sr.,
who was so largely in debt and insolvent, was a secret trust,
made with a view to giving William P., Sr., the beneficial
use and enjoyment of the half of the 120 acres of land, and
to secure it from his creditors by a conveyance from his
sisters to his minor son, who it is conceded gave nothing for
the land. *Dean v. Skinner,* 42 Iowa, 418.

The propositions of law above announced are so funda-
mental and so well established that I do not need to further
fortify them with authority. I have never heard any doubt
expressed about any of them. And if the facts above recited
do not make out a strong, if not impregnable, case of fraud,
I do not know how to construct one, unless we are permitted
to see into the secret purpose of the actors, which, unfortu-
nately, we can never do. Assuming, then, as I think I am
justified in doing, that these facts call for an explanation,
if any truthful one could be given, from those who were
parties to the transaction, and in whose breasts is locked the
secret of the making of the conveyances, what is the rule?
Certainly it was the duty of those having the sole and only
information regarding the matter to testify to the facts, if

they existed, which showed the *bona fides* of the transaction tion; and, if they fail to do so, we are justified in inferring that the transaction is as it appears to be on its face. We have many times held failure to explain such transactions the best evidence as to their fraudulent, character. *Corn Exchange Bank v. Applegate,* 91 Iowa, 411; *Clements v. Moore,* 6 Wall. (U. S.) 315, 18 L. Ed. 786; *Glenn v. Glenn,* 17 Iowa, 498; *Brittain v. Plowman,* 113 Iowa, 624; *Dunning v. Baily,* 120 Iowa, 733; *Peterson v. Rone,* 76 Iowa, 447; *Gwyer v. Figgins,* 37 Iowa, 517. In none of these cases was the *prima facie* showing as strong as in this.

Let us now see if any of these persons who knew why and for what purpose these conveyances were made have frankly and truthfully explained the same. Maggie and William P. Hickey, Sr., were witnesses in the case. Here is Maggie's testimony as to how the conveyances came to be made:

After my father's death my two sisters and myself deeded one-half our interest in the 120-acre farm to young William P. Hickey, a little boy, the son of our brother, the other half to our brother John. We received nothing from young William P. Hickey for this deed. There was no money passed, neither to me nor either of my sisters. And I now make no claim to any part of the 120 acres. [The 120 acres referred to is the property in dispute in this petition.] We received a deed to the home farm, 244 acres. William P. Hickey and John Hickey, our brothers, made a bill of sale to we three girls for all the personal property. William P. Hickey signed this just like he did the deeds. We three girls received the home farm, the timber land, the lots in Clarence, and all the personal property. . . . Everything was settled before I was appointed administratrix.

This is all she said about why and how the conveyances came to be made. William P. Hickey, Sr.'s testimony is even more unsatisfactory. Here it is:

I was not present at the meeting of the heirs on the farm after father's death. Yes; I signed a deed. My brother-in-law, O'Connor, was present. He is an attorney. If I remember right — he delivered some notes to me, but I don't remember what they were. It might be he delivered this one. I could not say. He came over to my store, representing my sisters, for my signature. I said he might have brought these notes over. I don't remember that Exhibit A was one of them. I don't know what he said to me, except he said something. I signed a deed that he presented to me in behalf of my sisters. I signed it without objection. I don't think I ever asked any questions. That deed was for 252 acres of land, the homestead and the timber, and the town lots in Clarence. I don't know whether I asked him any questions at all or not. No, sir; there was nothing said after father's death between me and my sisters, prior to my signing this deed with reference to any division of the property — nothing at all. I had no conversation whatever in regard to that matter up to the time of signing the deed. I did not see my sisters at all. I mean to say I had no talk with my sisters after father's death up to this time of signing the deed with reference to a division of the property, or to surrender these notes.

This, then, is William Hickey's explanation as to why and how the deeds came to be made. To my mind it is very far from satisfactory, and, even were the other testimony in equipoise, I would regard William P. Hickey's testimony, which I have quoted in full, as quite conclusive evidence of an attempt on his part to cover up his interest in his father's estate, so that creditors might not reach it. Credulous, indeed, must one be who regards this as a satisfactory explanation of a *prima facie* case of fraud. What is it, then, which the majority regard as sufficient to overcome this *prima facie* case? Why, this, and only this: That William P. Hickey, Sr., had received from his father by way of loans or advancements all that he was entitled to of his father's estate. This I do not believe, but, even if it were true, it does not amount to that full and frank explanation

as to the reason why these various conveyances were made. That is left to pure inference without one word of positive testimony to sustain it, although it must be conceded, if this were the true reason, that ordinarily the parties involved would be glad, indeed, to testify to it, if it were true.

Was any accounting had at the time these deeds and this bill of sale were made to determine what each heir was entitled to receive? Was it agreed that William P., Sr., had no interest in the property left by his father? Is any reason given for making the conveyance to one of the heirs and a six year old son of the other? Was any accounting had between John, Jr., and the women heirs? No; nothing of this kind. No one pretends that there was any accounting or settlement as between the heirs, save such as the papers indicate. No one says that it was agreed that William, Sr., had no further interest in his father's property, and that this was the reason for the conveyances. On the contrary, he proceeded as if he had an interest by joining in a deed with his brother, and in uniting with him in a bill of sale for the personal property, conveying all his interest in his deceased father's estate, save the 120 acres of land which was conveyed back to his brother and to his six year old son. Was not this an assertion of interest? If it was agreed that he had no interest, why did he join in the deed, and, if he had no interest, why did not his deed cover the 120 acres of land which was thereafter conveyed to his son and his brother? If he was making the deed to clear up the title simply, why did he not include the 120 acres of land as well as the 252 and the town lots? If made simply to clear the title, why was the conveyance made back to John and William P.'s son? Why was the conveyance made to the son? Was it because of the love and affection that his aunts, the grantors, had for him? They do not say so, and, as they are the only ones who hold that secret, we must conclude that, if this were true, they would have said so. Was it a pure gift to the little boy? No one says so. If that

were true, surely they would have so testified. Why did they not testify to one or the other of these things? Manifestly because they dare not.

And yet counsel, in the face of this record, want us to assume a state of facts, which his clients for some reason dare not testify to. Is the *prima facie* case made by this record to be met by inference upon inference; especially where the parties who knew all about it were on the witness stand, and did not for some reason, do more than testify to certain facts from which an inconclusive inference might be drawn? Again, why was not the deceased's estate administered upon in the regular way, and by one who would furnish security for the fulfillment of his trust? What was the hurry in getting the apparent title out of William P. Hickey, Sr.? Why were not the supposed claims for advancements presented to an administrator and the estate settled under the supervision of a court? Why was there no inventory taken of the property, as required by law? Why was all the property, save this 120 acres of land, conveyed to the female heirs? What was the value of this property when the decedent died? None of these questions are answered by any one.

But it is said that William P. Hickey, Sr., received, in advancements from his father before his death, all that he (William) was entitled to. I do not think the evidence shows it, and I do not believe that any one can fairly figure out this conclusion from the very unsatisfactory record we have before us, even conceding, *arguendo,* that the other heirs were insisting upon these advancements in the distribution of the estate. But, concede that upon an accounting now made, and which no one contends was made at the time of the transactions in controversy, it should be found that William P. Hickey, Sr., has received all he was entitled to; what does this amount to? Does it do more than furnish a reason which might have actuated the parties in making the division of the property? Surely this is all

that can be claimed for such testimony. A reason for making a particular agreement is not substantive proof that such an agreement was in fact made. The parties in interest might have insisted upon these so-called advancements, or they might not. In other words, advancements are not considered unless they are insisted upon. They are not inventoried by an administrator, and are not regarded as part of the assets of the estate, save for purposes of distribution, and then only when insisted upon by the other heirs. When the voluntary distribution was made between these parties, were these so-called advancements insisted upon? Who knows? Maggie Hickey and William P. Hickey, Sr. Do they say they were? Let the record answer. Not a breath or a whisper to that effect from either of them. Indeed, William says that there was no talk about the matter at all, and that he had no conversation with the other heirs at any time about the division of the property. What, then, is the fair inference? The answer to me is plain. That they then and there undertook to divide the visible property between them, and in making the conveyance back to the male heirs the name of the six year old son of William P. Hickey, Sr., was substituted in place of his father in the deed of the 120 acres of land to keep it out of the hands of his father's many creditors.

What reason have we for indulging in an inference which may or may not be true, when it was the duty of the parties who were on the witness stand, and in whose breasts the information lay, to speak the very truth, and for some reason they dare not say the word, but content themselves with allowing us to guess. Suppose we guess wrong; is any one liable for perjury? Suppose we say that the conveyance attacked was a pure gratuity to the minor son, or was made out of love and affection, and it should afterward turn out from unmistakable evidence that it was made to defraud; could Maggie or William Hickey be convicted of perjury?

Manifestly not, for neither has said anything of the kind; and yet their counsel would have us draw that inference.

But it is said that, if William had secured all he was entitled to from his father's estate, he furnished no part of the consideration for the conveyance to his minor son, and there is therefore nothing for his creditors to reach. Let us look at this for a moment. Even if he had received all that a court of probate would have awarded him, it does not follow that the heirs may not have waived these advancements or part of them. They were not bound to insist upon them, and, save for purposes of distribution, they were no part of decedent's estate. If they did insist upon them in this volutary settlement and division of the estate, it would have been very easy for the parties to have so testified. But they did not say so. What they in fact did negatives any thought of that kind.

But, if this be not true, it was incumbent upon them, under the rule above stated, to explain the transaction and to testify that this was the object, purpose, and consideration for the conveyances. This they did not do. Shall we say that they counted so much as advancements in settling up the estate and making the conveyances, when they do not say so themselves? Moreover, there is some evidence as to advancements made to the other, or some of the other, children. How much was advanced to each heir? Was any computation made as to what each had received? No; the record says there was no settlement. See *Floyd v. Floyd,* 7 B. Mon. (Ky.) 290, holding that a court cannot, on its own motion, direct an account of advancements with a view to equalizing the distribution of an estate. That an advancement is only to be considered in making division and distribution and not as property of the estate, see Code, Section 3383; *In re Miller,* 73 Iowa, 118; *Cleaver v. Kirk's Heirs,* 3 Metc. (Ky.) 270; *Cecil v. Cecil,* 19 Md. 72, (81 Am. Dec. 626). It is doubtful if they may be considered, save where an estate is being distributed in probate (*State v. R. R. Co.,*

59 N. H. 85; *Adams' Heirs v. Adams,* 22 Vt. 50), but, if they may, there should be an affirmative showing that they were so considered. That is wholly lacking here. But I need not pursue this proposition further. If there be anything in the showing made by the Hickeys, Maggie and William, it is simply that William, on a fair accounting long after the transactions in question were had, had received all that he was entitled to from his father's estate. This and this alone is all there is in their testimony. From this we are asked to draw the inference that this was the reason for the making of the conveyances referred to; and this, notwithstanding the fact that one was pressed for an explanation of the matter and refused to give it, and the other for some reason did not see fit to say that this was the reason for the way decedent's property was disposed of. I decline to do this.

One other thought: If William P. Hickey, Sr., furnished any valuable consideration for the property which was deeded to his minor son, no matter how small, the son confessedly having paid no part thereof, a resulting trust arose, for the question of adequacy or sufficiency of consideration does not arise in the case. That there was a consideration in the conveyance he made to his sister is very clear, and this should end the case. See *Roundtree v. Davidson,* 59 Wis. 522 (18 N. W. Rep. 518.) But William P., Sr., does not claim advancements exceeding $7,800. As the loan was converted into an advancement, no interest should be allowed, but the heir charged with money received. *Krebs v. Krebs' Ex'r,* 35 Ala. 293. Taking, as proper evidence of value, what the personal property sold for after the settlement was made, and other testimony as to the value of the real estate at a time different from that of the division of the property, which I may say is rather poor evidence as to its value when the division was made, I do not believe, when we also consider that he made some advancements to his other children, the amount of which is left to inference, that Willaim P., Sr., had received his full share. The visible property, including

advancements that we know about, and the cash, not includ-
ing some property of which we have no testimony as to its
value, amounted to $49,200. One-fifth of this would go to
each heir. This is practically $10,000. So that there was
at least $2,000 in value going to William P., Sr. But why
speculate upon this, when the heirs themselves did not make
any accounting, as they say, when they divided the property
among themselves? No one says that they estimated the
value of the property or took into account the advancements
made, or that the deeds were made to show that William P.,
Sr., had no interest in the land. Why should we infer these
things in the absence of some testimony from the active par-
ticipants, who were under a positive duty to explain the
entire transaction? Why give the case any other color than
it bears on the face of the papers?

    To my mind the case is an unusually clear one, and we
have no right to make a supposed settlement for these parties
and attempt to equalize matters for them, when they them-
selves do not say there was any attempt to do so when the
conveyances in question were made. Does any one suppose,
if the transaction was fair, open, and free from fraud, that
Maggie and William Hickey, Sr., would not have said so, and
explained it according to some of the inferences suggested
by the majority? Does any one believe that if the con-
veyance to the minor son of William P. Hickey, Sr., was out
of love or affection, or a March gift to him, due to their
regard for him, Maggie Hickey would not have said so? As
she did not, what is the fair, the reasonable, inference? Does
any one suppose that if William Hickey, Sr., had deeded his
interest in the lands and personal property left by his father,
which, as we have seen, he did not do, for he left out the 120
acres redeeded to his son and brother, to his sisters without
any consideration, and because, after a conference, they had
concluded that he had had his share, he would not have said
so? Did he do so? Let the record which I have quoted
speak. Why was the land conveyed to this six year old son of

William P., Sr., who was insolvent and largely in debt? Do the aunts of this boy say it was a gift to him, or because they loved him? No; nothing of the kind. Who furnished the consideration? He did not. So far as this record shows, the sole and only consideration for the deed to the boy was the conveyance by William, Sr., and his brother, John, to their sisters of their interest in all the property of the deceased father, save the 120 acres of land deeded back immediately to John and the minor son, William, Jr. If we are to indulge in inference only, it seems to me there is enough here to make the plainest kind of a case of resulting trust, and of actual fraud as well.

The majority have entirely overlooked the fact that from the face of the records and papers in the case we have a strong *prima facie* showing of fraud, and are insisting that the case is one of inference only. This, in my judgment, is not true, and if my preliminary statement of the case, which cannot be challenged, does not make out a *prima facie* case for the defendants not only of fraud, but of a resulting or secret trust, I do not know how one can be made. The truth, in my judgment, is that the majority are treating a mere inference upon an inference as a satisfactory explanation of a strong *prima facie* case. If persons may do as the parties did in this case, and yet not be called upon when the conveyances are challenged to explain them, it is very easy to perpetrate a fraud by a voluntary partition and distribution of property. An impecunious heir has been shown the method whereby to defeat the honest claims of his creditors.

As to the suggestion of the majority that the pleadings do not raise the issues I have been discussing, there are three answers, any one of which is, in my opinion, sufficient to relieve of all anxiety on this score: First. Counsel concede in argument, both oral and in print, that they do involve the questions I have discussed; at least they make no point that the issues are not broad enough to reach these matters. Second. Plaintiffs are John Hickey and William P. Hickey,

Jr., the grantees in the deed of the 120 acres of land. They allege the levy of an execution by defendants upon the 120 acres of land as the property of William Hickey, Sr., and aver that he never had any interest therein, and further aver that neither Maggie nor Nellie Hickey, nor Mary O'Connor, have any interest in the land. In their prayer they asked that their title be established, defendant's judgment declared no lien upon the land, that the levy of the execution be set aside, and that the sheriff be enjoined from selling.

Defendants in answer, in addition to a general denial, pleaded fraud in the transactions I have discussed, not only as a bar to plaintiffs' prayer for relief, but affirmatively by way of cross-petition. This being true, plaintiffs must recover on the strength of their own title, and not on any alleged weakness of their adversaries. When once it is established that William P. Hickey's title in and to the 120 acres of land was fraudulent and void, or was held in trust, resulting, or secret for his father, his case is at an end, no matter what the prayer in defendant's cross-petition. He must establish that he holds title to the land, or to one-half thereof, and if it be shown, as I have said, that his title is fraudulent or in trust, his case is at an end. Third. In the cross-petition filed by defendants all the transactions I have commented upon as showing fraud, and a trust in the plaintiff William Hickey, Jr., are pleaded with sufficient fullness, and the relief prayed is that the interest pretended to be conveyed to the minor child, William, Jr., be held subject to defendants' execution, that the injunction be dissolved, and the judgment established as a lien against William P. Hickey's undivided one-fifth interest in and to the 120 acres of land.

The majority seem to think that this last clause of the prayer for relief is conclusive. But not so. By Code, section 3775, where there is an answer to the petition or a cross-petition, the court may grant any relief consistent with the case made and embraced within the issue. See, also, *Wilson v. Miller,* 16 Iowa, 111. So that, in my judgment,

there is nothing in the majority's suggestion as to the sufficiency of the pleadings in the case. I have gone over the record in this, and another like case which is now pending on rehearing, many, times, and have no hesitation in affirming that the land should be subjected — that is, the one-half of the 120 acres — to the payment of defendants' judgment.

I should unhesitatingly reverse.

Sherwin, J. — I concur in this dissent.